UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TECHRESERVES INC.,                        :

                      Plaintiff,      :

          -against-              :

DELTA CONTROLS INC.,                      :
INTEGRATED BUILDING CONTROLS, INC.,       :
JOHN MITRO, JAY GARBARINO, ERHARD         :
DOBLER, DAVID GUTHRIE, MICHAEL            :
CASOLARI, and SCOT STICKLE,               :

                   Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM DECISION
AND ORDER**

13 Civ. 752 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiff TechReserves Inc. brings federal and state antitrust claims against Defendants

Delta Controls, Inc. ("Delta"), Integrated Building Controls, Inc. ("IBC"), and the above-named

individual defendants. (Complaint, ECF No. 1.) Plaintiff also asserts a claim of tortious

interference with business relations against Defendants. Pursuant to Federal Rule of Civil

Procedure 12(b)(6), all Defendants made a Joint Motion to Dismiss Plaintiff's Complaint With

Prejudice for failure to state a claim. ("MTD," ECF No. 16.) Defendant David Guthrie also

moved for dismissal under Rule 12(b)(2) for lack of personal jurisdiction. (*Id.* at 33-34.)

Plaintiff has failed to allege facts sufficient to establish general or specific jurisdiction

over Defendant Guthrie. Guthrie's motion to dismiss for lack of personal jurisdiction is

therefore GRANTED. Plaintiff has also failed to adequately allege facts to support key elements

of each of its antitrust claims against the Defendants.  Therefore, Defendants' motion to dismiss the antitrust claims for failure to state a claim is also GRANTED.[1]

## I.   **Factual Allegations**

Plaintiff is a New York corporation that operates as a value-added reseller ("VAR") of building management systems ("BMS") products.  (Compl. ¶ 7.)  BMS products are hardware- and software-based enhancements to building control systems.  BMS products are used in commercial and other buildings to, among other things, regulate a building's climate, lighting, and access points, as well as to monitor system performance and device failures, and generate notifications to building engineering and maintenance staff as necessary. (Compl. ¶¶ 24, 26-28.)

Defendant Delta is a Canadian-based manufacturer of BMS products.  (Compl. ¶¶ 8, 21.) Delta employs an open-source building automation and control software ("BACnet protocol") in its BMS products, enabling different building automation devices to communicate with each other, regardless of the particular building function that each device performs.  (Compl. ¶¶ 31-32.)  The BACnet protocol is one of several types of open-source software products that are alternatives to "proprietary" software manufactured by some other BMS vendors.  (Compl. ¶¶ 30-31.)  Delta is a native BACnet independent product vendor, manufacturing the type of product generally specified and required by building owners on new and "important" construction projects in the New York area.  (Compl. ¶ 39.)  Defendant IBC is a New Jersey corporation that operates as a VAR of BMS products, including those manufactured by Delta. (Compl. ¶ 9.)

BMS manufacturers customarily sell their products to building owners through authorized VARs, many of which both distribute the BMS product and provide installation and

---

[1] Given the dismissal of all federal claims brought by Plaintiff, Plaintiff's state law tortious interference with business relationships claim (Count IV of the Complaint) is DISMISSED for lack of subject matter jurisdiction.

required post-installation maintenance and support services to those purchasers. (Compl. ¶¶ 33-35.)  Building owners routinely determine which BMS to use in their construction projects by soliciting bids from VARs, which bids are generally price-dependent.  (Compl. ¶¶ 37-38.)  In order to submit competitive project bids to building owners, VARs often align themselves with specific BMS manufacturers to obtain competitive pricing.  (Compl. ¶ 38.)  According to Plaintiff, Delta manufactures the "most powerful native BACnet products commercially available in the United States," such that "use" of Delta's products is a "competitive advantage in the market." (Compl. ¶¶ 40-42.)

Plaintiff and Defendant IBC are direct competitor VARs in the BMS sales, installation, and maintenance markets.  (Compl. ¶¶ 36, 43.)  Plaintiff alleges that Defendants, over at least the past eight years, have engaged in an ongoing conspiracy to use Delta's alleged market power to restrain competition in the BACnet product market.  Plaintiff claims that Defendants exclude VARs – other than IBC – from selling, installing, and servicing Delta BACnet-specified BMS products, and force BMS purchasers to utilize IBC's services if they want to buy Delta products. (Compl. ¶¶ 4 (characterizing alleged conduct as "illegal tying scheme"), 44, 51, 54(e), 93-99 (outlining Defendants' "Illegal Tying Arrangement"), 106, 122, 129.)  Defendants allegedly execute the tying scheme by enticing VARs other than IBC to procure BACnet-specified BMS projects for Delta products (Compl. ¶¶ 45, 47, 49-52), and Defendants together systematically force the procuring VAR off the project and transfer the contract to IBC (Compl. ¶¶ 53-55).  This transfer is allegedly effectuated by Delta or IBC conveying to the building owner that IBC is the only VAR permitted to sell, install, and service Delta BMS products on that project.  (Compl. ¶ 5(c), 54(b).)

Plaintiff seemingly claims an entitlement to bid on Delta BMS projects based on (i) an agreement between Delta and TechReserves' principal, non-party Gary Pelletier, to build and promote the New York market for the sale of Delta BMS components; (ii) Delta's "encourage[ment]" of Plaintiff's efforts to do so; (iii) a purported "promise" by Delta that Plaintiff could distribute Delta products; and (iv) Plaintiff's stated "right to go out as a value added reseller . . . and sell solutions of open systems, building management systems to owners."[2] (Compl. ¶¶ 3, 71-81; Sept. 4, 2013 Oral Argument Transcript ("Tr.") 27:19-21.)  Plaintiff alleges that it was specifically subject to – and harmed by – Defendants' anticompetitive tying arrangement in late 2011 and early 2012, when it was encouraged by Defendants to secure the $1.5 million One Police Plaza ("OPP") project for Delta, only to be forced off of the project in favor of IBC.  (Compl. ¶¶ 82-92.)[3]

## II.   Personal Jurisdiction Over Defendant Guthrie

Defendant Guthrie moves to dismiss all claims against him for lack of personal jurisdiction.  (MTD at 33-34.) Plaintiff alleges that Guthrie was employed as a regional sales manager by Delta from 2003 to 2005, and traveled to New York during that time "for the specific purpose of establishing the scheme and conspiracy complained of herein."  (Compl. ¶ 13.)  Plaintiff's allegations merely state that "Guthrie began a conspiracy" with IBC.  (Compl. ¶¶ 47-50.) Plaintiff conceded at oral argument that its allegations were not sufficient to establish general jurisdiction over Defendant Guthrie.  (Tr. 63:9-14.)

Plaintiff has also acknowledged that its Complaint does not contain factual allegations of any specific conspiracy-related activity that it contends Guthrie engaged in while in New York.

---

[2] Plaintiff has brought no breach of contract claim against Delta in this case and expressly disavows such a claim. (MTD Opp'n at 1; Tr. 32:5-19.)  Delta likewise asserts that it has no contract with Plaintiff. (MTD Mem. at 3.)

[3] Neither Plaintiff nor Defendants claim that Delta or IBC ever obtained the OPP project after Plaintiff's removal.

(Tr. 57:17-58:20, 63:15-64:2.)  Instead, Plaintiff's counsel proffered facts – based on information and belief, and relying only on his notes to himself – that Guthrie "engineered the closure of certain Delta dealers and gave an exclusive arrangement contract to IBC," "terminated certain VARs," "compelled owners to work solely with IBC, and went on a coordinated effort and campaign with the principals of IBC to devise a program to exclude VARs from cherry-picked work." (Tr. 57:14-25, 61:5-8, 61:20-24, 63:15-64:2.)  As this Court noted on the record, these statements – even if they had been alleged in the Complaint – are too conclusory to establish specific jurisdiction over Guthrie.  (Tr. 61:20-62:9.)  The statements are not supported by sufficient facts to infer that Guthrie came into New York and purposefully directed his activities towards starting an antitrust conspiracy or acts of tortious interference which Plaintiff alleges caused the harm in this case. *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 659, 674 (2d Cir. 2013) (internal citations and quotation marks omitted) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985)) (specific jurisdiction exists where a defendant has "purposefully directed his activities" at the relevant forum, and where "the litigation results from alleged injuries that arise out of or relate to those activities").  Defendant Guthrie's motion to dismiss for lack of personal jurisdiction is therefore GRANTED.

### III.   Rule 12(b)(6) Standard

To survive a motion to dismiss, "a [pleading] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This plausibility standard demands more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Rather, to state a facially plausible claim, *Iqbal* requires a party to "plead[] factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged" (*id.*), and those factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The *Iqbal* Court suggested a two-pronged approach by which courts may assess whether a complaint states a plausible claim for relief. *Iqbal*, 556 U.S. at 678-79; *see also Hayden v. Patterson*, 594 F.3d 150, 161 (2d Cir. 2010). A district court may first review Plaintiff's Complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679; *Hayden*, 594 F.3d at 161-62. The Court then considers whether Plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. For the purposes of this 12(b)(6) motion, Plaintiff's well-pleaded facts are assumed to be true and all reasonable inferences therefrom are construed in the light most favorable to Plaintiff, the non-moving party. *See Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009). Nevertheless, the allegations comprising Plaintiff's Sherman, Clayton, and Donnelly Act claims fail to satisfy the *Twombly* and *Iqbal* requirements.

## IV.   Federal Antitrust Claims

Plaintiff alleges that Defendants unlawfully conspired to, and did, restrain trade in the market in which Plaintiff and Defendant IBC compete. (Compl. ¶ 1.) Plaintiff claims that, in doing so, Defendants violated Sections One and Two of the Sherman Act (15 U.S.C. §§ 1, 2) and, derivatively, Sections Four and Sixteen of the Clayton Act (15 U.S.C. §§ 15(a), 26). To properly state a claim under either section of the Sherman Act, a plaintiff must allege a relevant market in which Defendants have exercised sufficient market power to impair competition or restrain trade, and anticompetitive harm that affects the market as a whole. *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 383 (S.D.N.Y. 2007); *Mathias v. Daily News, L.P.*,

152 F. Supp. 2d 465, 480 (S.D.N.Y. 2001) ("The requirement of pleading a relevant market is closely intertwined with the element of antitrust injury, or harm to competition in the market. Simply put, the latter is not possible without the former.").

A.     Frameworks of Antitrust Analysis

A district court reviews allegations of antitrust violations using one of three analytical frameworks: *per se* analysis, quick-look Rule of Reason analysis, or traditional Rule of Reason analysis.[4]  *See Integrated Sys. & Power, Inc. v. Honeywell, Int'l, Inc.*, 713 F. Supp. 2d 286, 297-98 (S.D.N.Y. 2010); *accord Safeway*, 651 F.3d at 1132-34.  The facts in the Complaint make it clear that Plaintiff alleges a vertical restraint, arising from a purported agreement between a manufacturer and its distributor (here, a "value-added reseller").  (Compl. ¶¶ 24-25, 4, 45.) Vertical restraints hold the potential to have procompetitive effects on a market and therefore do not give rise to *per se* treatment; they are to be analyzed under the Rule of Reason.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) ("[C]ombinations, such as . . . vertical agreements, hold the promise of increasing a firm's efficiency and enabling it to compete more effectively. Accordingly, such combinations are judged under a rule of reason."); *Cont'l v. GTE Sylvania, Inc.*, 433 U.S. 36, 58-59 (1977) (vertical agreements are not presumptively unlawful).

Nor is quick-look analysis appropriate for the type of violation alleged here.[5]  *Integrated Sys.*, 713 F. Supp. 2d at 297.  Plaintiff alleges that Defendants' challenged conduct created an

---

[4] Plaintiff contends that it is inappropriate to determine which of these analytical frameworks applies to its allegations on a motion to dismiss.  (MTD Opp'n at 17, 24.)  The method of analysis selected in this case, however, is inconsequential, as Plaintiff has not sufficiently alleged a restraint of trade under any of these frameworks.

[5] A conspiracy alleged to target only one product of one manufacturer's brand merits Rule of Reason review and is not an appropriate basis for *per se* or quick-look analysis. *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997) ("Because one manufacturer's product was involved . . . the agreement was not per se illegal and rule of reason analysis applied."); *Integrated Sys.*, 713 F. Supp. 2d at 297 ("A conspiracy to eliminate competition with respect to one component . . . , within one brand, within an industry in which Plaintiff

increased market demand – a procompetitive benefit – for Delta BMS products (Compl. ¶ 46), and admits that there were other manufacturers from which Plaintiff could purchase BACnet products, and even other sources from which to purchase Delta products (Compl. ¶¶ 31, 38; *see also* MTD Reply at 11-12; Tr. 33:5-7, 47:18-24). These representations preclude quick-look analysis because they undercut Plaintiff's assertions that Defendants' alleged tying arrangement is "a naked restraint" with "readily anticompetitive effects" that "lacks any procompetitive benefit." (MTD Opp'n at 19, 23.) The Rule of Reason analysis requires "an inquiry into market power and market structure designed to assess [a restraint's] actual effect." *Copperweld Corp.*, 467 U.S. at 768. On the facts as alleged by Plaintiff, Rule of Reason analysis is appropriate in this case.

###### B.      Plaintiff Fails to State A Claim Under Section One of the Sherman Act

To state a claim under Section One of the Sherman Act (and Clayton Act §§ 4, 16), Plaintiff must allege sufficient facts to plausibly establish that (i) Defendants entered into a contract, combination, or conspiracy that (ii) unreasonably restrained competition or trade (iii) in the relevant market and (iv) caused Plaintiff to suffer an antitrust injury. *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 103 (2d Cir. 2000) (internal quotation marks and citations omitted) ("To make out a Section 1 violation of the Sherman Act, a plaintiff must allege a combination or some form of concerted action between at least two legally distinct economic entities that constituted an unreasonable restraint of trade either per se or under the rule of reason. In addition, a plaintiff must independently show antitrust injury.").

---

has not alleged a lack of substitutes is not the type of restraint that is so 'manifestly anticompetitive,' or that 'would always or almost always tend to restrict competition and decrease output,' nor is it a restraint with which 'courts have had considerable experience' such that a *per se* rule would be appropriate."); *id.* (rejecting conspiracy targeting single brand as the type of "naked restraint" that would warrant a quick-look analysis).

1.   Plaintiff Has Not Pled A Plausible Relevant Market

In order to bring a viable antitrust claim against a defendant, an antitrust plaintiff must allege a plausible relevant market, consisting of both a geographic market and a product or service market. *See, e.g., City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under . . . §§ 1 or 2 of the Sherman Act, or New York's Donnelly Act, a plaintiff must allege a plausible relevant market in which competition will be impaired."). The relevant market must be defined in "economically meaningful terms, since one cannot prove market-wide competitive harm without first establishing the market in which it is to be measured." *Discon, Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 159-60 (W.D.N.Y. 2000).

Defendants argue that Plaintiff's Complaint should be dismissed for failure to adequately plead the requisite geographic and product markets.  (MTD Mem. at 9-12; MTD Reply at 7, 13-15.)  Courts have found that failure to adequately plead either of these markets is sufficient to justify dismissal.  *E.g., Mathias*, 152 F. Supp. 2d at 481 ("Taken together, the product and geographic components illuminate the relevant market analysis, which is essential for assessing the potential harm to competition from defendants' alleged misconduct. Therefore, courts have held that without a proper delineation of both the product and geographic markets, a claim under § 1 or § 2 of the Sherman Act will be dismissed.").  Under the Rule of Reason, both the relevant market definition and the adverse effect on competition are "requirement[s] that must be alleged at the pleading stage and can be the basis for a motion to dismiss." *Integrated Sys.*, 713 F. Supp. 2d at 299.

Plaintiff's claims fail at the outset because Plaintiff's factual allegations do not support a statement of a relevant market by which this Court can determine whether the alleged anticompetitive conduct and harm occurred. *Walker Process Equip., Inc. v. Food Mach. &*

*Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the relevant] market there is no way to measure [a defendant's] ability to lessen or destroy competition."). Plaintiff claims that the relevant geographic market is "the Metro New York market." (*See* Compl. ¶ 1; Tr. 26:15.)

> a. The Alleged Product Market Is Insufficiently Defined and Factually Unsupported

Plaintiff describes the relevant product market in varying, inconsistent, and imprecise terms. Plaintiff alleges that the relevant product market is, alternately, "BACnet products" (Compl. ¶¶ 1, 19, 22-23, 54, 84), "BMS products" (Compl. ¶¶ 2-5, 46, 52, 59, 86, 90, 98, 111-112, 115, 122), and "Delta products" or "Delta BMS products" (*See, e.g.,* Compl. ¶¶ 5, 45, 51, 93). Plaintiff limits the relevant products market to BACnet products, but then – on numerous occasions – factually narrows the alleged product market, in violation of the "reasonably interchangeable substitutes" rule, to that of one manufacturer's products (Delta's). Plaintiff's antitrust claims thus fail because Plaintiff does not allege a consistent relevant product market that is factually supported in its Complaint.

It is well-established that a non-unique single-brand product, like Delta's, does not a market make. Claims that unjustifiably attempt to exclude some or all of a product's reasonably interchangeable substitutes from the relevant market, or narrow a non-unique product market to a single brand, are subject to dismissal.[6] Moreover, "[t]he law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market." *Deep South Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*, No. 88 Civ. 6243, 1989 WL

---

[6] *Todd*, 275 F.3d at 200 (collecting cases) ("Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way."); *Mathias*, 152 F. Supp. 2d at 483 (dismissing Sherman Act claims because, in part, plaintiff's "proffered product market is artificially based on a single brand name product").

48400, at *8 (S.D.N.Y. May 2, 1989) (collecting cases).  Such a limitation on the relevant market

is more appropriate for a unique product, the presence of which Plaintiff has not alleged in this

case.[78]  At best, Plaintiff has only established that Delta has a natural "brand monopoly" over its

own products and their distribution, which in itself is not cognizable as an antitrust violation.

*Spectrofuge Corp.*, 575 F.2d at 282.  Plaintiff's attempts to limit the product market exclusively

to Delta products impose the type of artificial and unjustifiable limitations on the relevant market

that are prohibited by the law of this Circuit.  Dismissal of Plaintiff's antitrust claims is

warranted on this basis.

Plaintiff contends that it has sustained antitrust injury due to its inability to sell Delta

products because Delta's products are considered to be the best, or the "most powerful," on the

market.  (Compl. ¶ 40; *see also* MTD Opp'n at 3-4 (describing Delta BACnet platform as the

"superior product".)  But Plaintiff's preference, and inability, to sell the best product on the

market cannot support an antitrust claim.[910]  Without a showing of some sort of market

---

[7] *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978) ("[S]uch a limited market would be appropriate when, for example, . . . a firm's product has total market dominance as opposed to mere 'brand' monopoly; that is, if the firm's product is so unique or so dominant in the market in which it competes that any action by the manufacturer to increase his control over that product virtually assures that competition in the market will be destroyed.").

[8] Plaintiff's allegations actually indicate just the opposite, stating that Delta manufactures one of a number of brands of BACnet products, which are a subset of a larger assortment of BMS products, all of which are potential substitutes for one another. (*See* Compl. ¶¶ 31, 40, 42, 54, 57, 65.)

[9] The law has long been clear that a single purchaser's preferences cannot define a product market. *See NYNEX Corp.*, 86 F. Supp. 2d at 160-61 (citing *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir.) (finding no Sherman Act violation where alleged product market monopolized by TNT consisted only of the TNT channel, because a company is permitted to hold a natural monopoly over its own product); *Int'l Logistics Grp., Ltd. v. Chrysler Corp.*, 884 F.2d 904, 908–09 (6th Cir. 1989) (seller's loss of contracts with a single government purchaser is not cognizable under the Sherman Act); *Disenos Artisticos E Industriales, S.A. v. Work*, 714 F. Supp. 46, 47–48 (E.D.N.Y. 1989) (generally, a single product market cannot be its own relevant market)).

[10] *Group Health*, 649 F.3d at 156 (affirming dismissal of federal and state antitrust claims on the ground that the alleged relevant market was "legally insufficient because it is defined by [a single purchaser's] preferences, not according to the rule of reasonable interchangeability and cross-elasticity of demand"); *du Pont*, 351 U.S. at 392-93 ("A retail seller may have in one sense a monopoly on certain trade because . . . no one else makes a product of just the quality or attractiveness of his product."  However, this sort of market dominance "is not the power that makes an illegal monopoly.").

dominance, Plaintiff cannot state an antitrust claim based on the allegation that it is unable to sell the single best product on the market.

2. Plaintiff Has Not Adequately Alleged Defendants' Market Power

Plaintiff alleges that Defendants' anticompetitive conduct was "an illegal tying scheme." (Compl. ¶ 4.) That claim is reliant upon the exercise of Delta's market power to restrict Plaintiff's and other VARs' ability to install and service Delta BACnet BMS products. Thus, analysis of Delta's market power in the Delta BACnet product market is appropriate. *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006) ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product"). As there is no substantiated allegation of a direct adverse effect on the greater BACnet products market, such as reduced output, Plaintiff must allege facts to demonstrate that Defendants possessed and exercised market -- or monopoly – power in the relevant market.[11] *Tops Mkts.*, 142 F.3d at 96. Plaintiff may demonstrate Defendants' possession of market power by direct evidence of control over prices or exclusion from competition. Inference from a company's large market share, as market power, alongside an indication of anticompetitive behavior, may also serve as a proxy for adverse effects. *Geneva Pharms.*, 386 F.3d at 500; *Tops Mkts.*, 142 F.3d at 96-97.

Plaintiff has pled few facts as to Delta's or IBC's market shares, a critical factor in enabling the Court to determine whether Defendants possess and exercise market power in the relevant market. *See Geneva Pharms.*, 386 F.3d at 500-501; *Tops Mkts.*, 142 F.3d at 97. Plaintiff makes general and unsupported allegations of Delta's (or Defendants') "market power," "economic power," and "monopoly power" throughout the Complaint. (*See, e.g.*, ¶¶ 40, 41, 44,

---

[11] Market power is the power to control prices in, or exclude competition from, a particular market. *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004).

55, 96, 115-116.)  The only concrete measure of market share provided by Plaintiff up to this point is that BACnet products make up approximately 47% of the larger BMS products market (MTD Opp'n at 4 n.2), which does nothing to enhance this Court's understanding of Delta's or IBC's share of that 47% market segment.[12]  Plaintiff's failure to allege any facts in connection with Defendants' market share impedes this Court's determination of how much market power either Defendant may or may not have in the alleged relevant product market, which impediment, in turn, jeopardizes Plaintiff's ability to state a proper antitrust claim.

### 3.  Plaintiff Has Failed to Allege a Cognizable Antitrust Injury

Under the Rule of Reason, Plaintiff bears the initial burden of pleading antitrust injury by alleging facts demonstrating that Defendants' alleged conduct had an "actual adverse effect on competition as a whole in the relevant market"; if Plaintiff meets this burden, then Defendant must "offer evidence of the procompetitive effects" of their arrangement; and if Defendant satisfies that burden, Plaintiff must then establish that the procompetitive benefits proffered by Defendants "could have been achieved through less restrictive means." *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 316-17 (2d Cir. 2008).

Concerns about Plaintiff's relevant market allegations aside, Plaintiff has failed to adequately allege an essential element of all of its antitrust claims: actual harm to competition in the relevant market as a whole. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("[P]laintiff bears the initial burden of showing that the

---

[12] Assuming, *arguendo*, that the conduct alleged by Plaintiff is anticompetitive in nature, the significance of Defendants' market share is demonstrated by the fact that the analysis of whether Defendants' alleged conduct has anticompetitive effect would differ based on Defendants' market share.  For example, if Defendants forced VARs off of projects in favor of IBC when Delta had power over 99% of the BACnet products market, this would likely give rise to an inference of monopolistic harm to the market essentially controlled by Delta.  However, if Defendants engaged in the same conduct when Delta had only 1% market share, there is little to no likelihood that a violation of the antitrust laws would be found. *Cf. Geneva Pharms.*, 386 F.3d at 500-501 (finding that Defendant's "high market share . . . creates a strong inference of monopoly power"); *Tops Mkts.*, 142 F.3d at 96-97 (finding that the defendant's 72% market share was insufficient, alone, to support a Section One violation).

challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice. Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general."); *Primetime 24 Joint Venture*, 219 F.3d at 103.   Plaintiff claims that it has been harmed by Defendants' alleged anticompetitive conspiracy because it was forced off of the OPP project "at the 11 ½ hour," after having already executed agreements with the building owner and invested its time and resources in reliance on winning the OPP bid.  (*See* Compl. ¶¶ 77-90, 105, 121, 128; *see also* Tr. 33:19-35:9.)   For this injury, Plaintiff seeks (i) a judgment declaring that Defendants have violated and are violating the Sherman Act (139(a)); (ii) an injunction against Defendants' conduct (Compl. ¶¶ 138, 139(e)); and (iii) damages, post-trebling, in excess of $30 million (Compl. ¶¶ 67, 113, 123, 130, 136, 139(a)).

It is well beyond dispute that antitrust law exists to safeguard the benefits and incentives of competition in the marketplace, not to offer an individual competitor redress for a singular harm or a tool to assert itself into business relationships which an unrestrained market would not allow. *See Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 96 (2d Cir. 1998) ("The Sherman Act protects competition as a whole in the relevant market, not the individual competitors within that market.").  Aside from sweeping and unsubstantiated allegations of harm to competition in the market (*see, e.g.*, Compl. ¶¶ 68, 98, 103-104, 106, 112, 116, 118-119, 122, 127, 129), Plaintiff alleges facts to support its assertions of harm to competition in the relevant BACnet products market with respect to only one competitor: Plaintiff. (*See, e.g.*, Compl. ¶¶ 66, 88-90, 105, 121, 126, 128.)  Plaintiff's counsel admitted at oral argument that it has not alleged facts to support that Defendant's alleged conduct caused harm to a single VAR in the metro New York, BACnet products market other than itself.  Plaintiff has also failed to allege facts that support

any manifestation of harm resulting from the alleged conspiracy except for its allegations pertaining to the OPP project. Plaintiff conceded these pleading deficiencies at oral argument. (Tr. 35:1-37:9; 49:5-50:5 (Plaintiff's counsel explaining that Complaint alleges harm to no other VAR because Plaintiff "has been concerned about exposing these other VARs"); *id.* ("THE COURT: You know, if this [injury] only happened to your client, that you've got no claim, right? [PLAINTIFF'S COUNSEL]: In discovery, [Y[our Honor – exactly right. In discovery we believe we will meet all of our obligations.").) Because Plaintiff has alleged no facts in support of its claim that any VAR in the BACnet-specified installation and service market besides itself was harmed by Defendants' alleged conspiracy, Plaintiff has failed to meet its burden to sufficiently allege the essential element of anticompetitive harm to the relevant market.

Absent factual allegations of harm to market-wide competition, this Court has no basis to deem Defendants' conduct to be anything more than the result of permissible unilateral decisions by the respective companies or a lawful exclusive distributorship arrangement. *Verizon Commc'ns, Inc. v. Law Offices of Curtis Trinko, LLP*, 540 U.S. 398, 408 (2004) (The Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."); *see also Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir. 1978) (noting that "[i]t has always been the prerogative of a manufacturer to decide with whom it will deal"). The burden is on the Plaintiff, through allegations of specific facts, to demonstrate that the alleged conduct rises above these innocuous levels. *Twombly*, 550 U.S. at 557 ("[W]ithout some further factual enhancement," naked assertions of conspiracy and statements of parallel conduct, "even . . . consciously undertaken, . . . stay[] in neutral territory."). Plaintiff has not met

this burden to provide factual enhancement of its claims, and thus Plaintiff has not shown that it is plausibly "entitle[d] to relief." *Id.*

Plaintiff has failed to plead sufficient facts to support the inference that Defendants' conduct caused actual antitrust injury to the alleged market as a whole. This failure, in itself, is fatal to all of Plaintiff's antitrust claims.

4. Plaintiff Also Fails to Adequately Plead An Agreement and Coercion

Even if Plaintiff had successfully pled the prerequisite relevant market, market power, and injury elements of its Sherman Act claims, Plaintiff has not sufficiently alleged facts to support two essential elements specific to its Section One tying claim. Plaintiff alleges that Defendants entered into an unlawful agreement to restrain trade by tying the sale of Delta BACnet BMS products to an installation and service contract with Defendant servicer IBC. (Compl. ¶¶ 100-113.) Plaintiff fails to adequately plead the existence of an agreement and coercion.

a. Agreement Insufficiently Pled

Plaintiff asserts that Defendants entered into a conspiracy to restrain trade dating as far back as 2003, which conspiracy ultimately led to the harm Plaintiff allegedly suffered in 2012. (Compl. ¶¶ 45-69.) But Plaintiff provides no facts in its Complaint that would lead to the reasonable inference that an anticompetitive agreement was made between these Defendants. Indeed, without significantly more, Plaintiff's general allegations of Defendant Guthrie's business trips to New York and a prior association between Guthrie and IBC during Guthrie's pre-Delta employment by a Delta competitor (Compl. ¶¶ 47-50) do not suggest a conspiracy to engage in anticompetitive conduct. As noted above, these facts are entirely consistent with permissible unilateral decisions or a lawful exclusive distributorship arrangement, and will be

interpreted as such unless Plaintiff pleads facts to the contrary. *Twombly*, 550 U.S. at 557. Standing alone, Plaintiff's allegation that Defendants agreed is "obviously conclusory," and is not accepted as true on this motion to dismiss. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 319 n.2 (2d Cir. 2010); *see also Twombly*, 550 U.S. at 556-57 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."). Where, as here, there is an "'obvious alternative explanation' that is more likely, the plaintiff's cause of action is not plausible and must be dismissed." *Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010), quoting *Iqbal,* 556 U.S. at 682.

### b.   Tying Claim Insufficiently Pled

Plaintiff alleges that Defendants' Section One violation took the specific form of a product tying arrangement in which Delta BMS products were tied to installation and service of said products by Defendant IBC.  (Compl. ¶¶ 4, 54(e), 59, 93-99, 106.)  A tying arrangement exists when a seller refuses to sell a product unless the buyer also purchases a tied, or linked, product. *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958).  Even if Plaintiff had met its burden of pleading the essential elements of relevant market, Defendants' market power, antitrust injury, and conduct in violation of the antitrust laws (it did not), it would have failed to establish a necessary element of its tying claim.  To prove the existence of a tying claim, Plaintiff must allege sufficient facts to show: 1) "a tying and a tied product"; 2) "evidence of actual coercion by the seller that forced the buyer to accept the tied product"; 3) "sufficient economic

power in the tying product market to coerce purchaser acceptance of the tied product"; 4) "anticompetitive effects in the tied market"; and 5) "the involvement of a not insubstantial amount of interstate commerce in the tied market." *E & L Consulting Ltd. v. Doman Indus. Ltd.,* 472 F.3d 23, 31 (2d Cir. 2006) (internal quotation marks omitted).  Plaintiff has failed to plead facts that, if proven, would demonstrate that Delta is capable of coercing purchasers to accept the tied IBC services with Delta's BACnet products.

"[A]n antitrust defendant charged with illegal tying is entitled to some specificity as to the conduct alleged to be coercive, the customers who would have purchased a product elsewhere but for the coercion, the particular products sold as a result of the coercion, the anticompetitive effects in a specified market, and the effect on the business of the plaintiff." *Id.* at 32.  However, Plaintiff's allegations, taken as true, do not demonstrate coercion by Delta in the tied installation and service market.  Plaintiff did not – and based on its representations during oral argument, it cannot – allege that Defendant IBC actually got the OPP installation job that was allegedly taken from Plaintiff and now forms the basis of Plaintiff's claimed injury. Thus, contrary to Plaintiff's allegations that Defendants remove the project-procuring VAR from the desired project without sufficient time for the customer to replace the Delta-specified BMS product, Plaintiff itself explained on the record that the OPP purchaser opted to get another product once it discovered that Delta had designated a VAR other than Plaintiff for that project.[13] Absent factual allegations showing coercion, Plaintiff's tying claim must fail.

---

[13] (*Compare* Compl. ¶¶ 5(d) ("the customer is left with no competitive choice for an alternative BMS product or a different value added reseller"), 54(d) ("it is then too late in the bidding process for the introduction of a different BACnet BMS product into the job specifications"), 54(e) ("by this stage," customers "are already committed to the use of Delta specifications . . . and, consequently, the customer is unable to switch to a different VAR"), 94-96, 106 ("customers were forced to use IBC for the installation, and post0installation period maintenance, of the Delta products it purchased"), 111 ("the purchaser was, in fact, compelled to accept IBC as Delta's preferred vendor") *with* Tr. 53:7-13 (Plaintiff's counsel stating that "the Police Plaza engineers were so upset with that and did not and chose not to work with IBC for a variety of reasons that they canceled that whole spec") *and* Tr. 34:4-21 (Plaintiff's counsel stating that IBC did not win the OPP project bid "because the Police Plaza engineers . . . rewrote the specs

C.      Plaintiff Fails to State A Claim Under Section Two of the Sherman Act

Though not executed in terms that are by any means clear, it appears that, in the second count of the Complaint, Plaintiff also attempts to assert Section Two claims of monopolization, attempted monopolization, conspiracy to monopolize, or all three, against Defendants. (Compl. ¶¶ 114-123.) This Section Two claim is predicated on the same tying agreement facts as Plaintiff's Section One claim. A monopolization claim must allege: "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 73 (2d Cir. 1988). An attempted monopolization claim must allege "(1) anti-competitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a dangerous probability that the attempt will succeed." *Id.* at 73-74. A conspiracy to monopolize claim must allege: "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Id.* at 74. Because these Section Two claims are based on the same facts as Plaintiff's Section One claims, and because those facts have already been determined to be insufficient to support a claim of monopoly power or anticompetitive conduct on the part of Defendants, the monopolization and attempted monopolization claims fail. Because Plaintiff has pled no facts – only general statements – to support an allegation of Defendants' intent to monopolize, Plaintiff's conspiracy to monopolize claim fails as well.

Plaintiff's Sherman Act claims fail because Plaintiff has not sufficiently alleged facts to support a relevant market, antitrust injury to a relevant market as a result of Defendants' conduct, either Defendant's market share, or an agreement between Defendants. At best, Plaintiff has

---

and did a whole different job and used totally different software"); *see also* Tr. 20:13-18 (IBC counsel stating IBC did not get OPP project); MTD Mem. at 18 n.36, 20.)

pleaded facts "that are 'merely consistent' with liability," instead of "well-pleaded facts [that]

permit the court to infer more than a mere possibility of misconduct" on the part of Defendants

and to find that Plaintiff has shown plausible entitlement to relief. *See Ashcroft*, 556 U.S. at 678-

79 (citing Fed. R. Civ. P. 8(a)(2)). Despite Plaintiff's bald statements to the contrary, the

Complaint is bereft of facts that would alter the inference from one of Defendants' parallel

conduct or a lawful exclusive arrangement, to one of misconduct that raises the right to relief

above the speculative level. *Iqbal*, 556 U.S. at 678 ("[T]he threadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice."). Under *Twombly*

and *Iqbal*, the pleading standard imposed by Rule 8 "demands more than an unadorned 'the-

defendant-unlawfully-harmed-me accusation.'" *Id.*; *Twombly*, 550 U.S. at 555. Nothing more

than an unadorned accusation has been asserted here. Plaintiff's Sherman Act and Clayton Act

claims (Counts I and II of the Complaint) are DISMISSED.

## V.     State Law Claims

Plaintiff asserts an antitrust claim against Defendants under New York state law (the

"Donnelly Act," N.Y. Gen. Bus. Law § 340) and a state law claim against Defendants for

tortious interference with business relationships. (Compl. ¶¶ 124-137.)

This Court has supplemental jurisdiction over Plaintiff's Donnelly Act claim. 28 U.S.C.

1367(a). It is well-established that the Donnelly Act was modeled on the Sherman Act and is

generally to be construed in accordance with federal antitrust precedents. *Solla v. Aetna Health*

*Plans of New York, Inc.,* 14 F. Supp. 2d 252, 259-60 (1998), *aff'd*, 182 F.3d 901 (2d Cir. 1999).

Indeed, the parties do not dispute that the Court's Sherman Act analysis also applies to the

Donnelly Act claim. (*See* MTD at 29-30 ("Since Plaintiff's federal antitrust claims fail, so too

does its Donnelly Act claim."); Pl.'s Opp'n at 30 ("Since Plaintiff's federal antitrust claims

stand, so too does its Donnelly Act claim.").)  Accordingly, because Plaintiff has failed to allege

sufficient facts in support of its Sherman Act claims, its state law Donnelly Act claim based on

the same conduct must also fail.  The state law antitrust claim (Count III of the Complaint) is

DISMISSED.

A district court may decline to exercise supplemental jurisdiction when it has dismissed

all claims over which it had original jurisdiction (here, Plaintiff's federal antitrust claims).  28

U.S.C. 1367(c)(3); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A

district court's decision whether to exercise [supplemental] jurisdiction after dismissing every

claim over which it had original jurisdiction is purely discretionary.").  This Court declines to

exercise supplemental jurisdiction over Plaintiff's state law tortious interference with business

relationships claim.  That claim (Count IV of the Complaint) is hereby DISMISSED for lack of

subject matter jurisdiction.

## VI.     Entitlement to Discovery

Plaintiff's argument that a disposition at this juncture would be premature because

Plaintiff is entitled to proceed with discovery is misconstrued.  (*See* Tr. 64:12-18 ("We believe

we are entitled to proceed with discovery."); *see also* Tr. 50:5 ("In discovery we believe we will

meet all of our obligations.").)  In order for Plaintiff to be entitled to discovery, *Twombly's*

plausibility standard requires that Plaintiff first plead "enough fact to raise a reasonable

expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

As Plaintiff has not pleaded facts sufficient to render the conclusory allegations of Defendants'

anticompetitive conduct plausible, it is not entitled to engage in discovery in order to determine

whether it can state a plausible claim. *Podany v. Robertson Stephens, Inc.*, 350 F. Supp. 2d 375,

378 (S.D.N.Y. 2004) ("[D]iscovery is authorized solely for parties to develop the facts in a

lawsuit in which a plaintiff has stated a legally cognizable claim, not in order to permit a plaintiff to find out whether he has such a claim."); *accord Twombly*, 550 U.S. at 558 (internal citation omitted) ("The costs of modern federal antitrust litigation and the increasing caseload of federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.").

## VII.   Leave to Amend

Given the deficiencies in the Complaint identified by this Court, as well as Plaintiff's inability, at oral argument, to articulate or identify facts giving rise to a plausible inference of anticompetitive conduct on the part of Defendants, leave to replead would be futile. Plaintiff has provided this Court with no reason to believe that it can, given the opportunity, replead in good faith the factual allegations necessary to move its case forward. Accordingly, because providing Plaintiff leave to amend would be futile, Plaintiff's request for leave to amend is DENIED.[14] *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (it is within the discretion of the District Court to deny leave to amend when amendment would be futile); *Absolute Activist Value Master Fund, Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012) (citation omitted) ("[A] request to replead should be denied in the event that amendment would be futile.").

---

[14] Although leave to amend is denied to Plaintiff on other grounds, this Court expressly rejects Defendants' argument that a "pre-filing exchange" between the parties should preclude approval of Plaintiff's amendment request. (MTD at 33; Decl. of Michael Lindsay ¶¶ 4-6 .) Plaintiff is under no obligation to fashion its Complaint in the manner that Defendants see fit. Such a principle or policy would unduly impinge on a plaintiff's prerogative to assert its claims according to its own objectives and strategy, whether or not such strategy is ultimately successful.

<u>Conclusion</u>

Defendant Guthrie's motion to dismiss pursuant to Rule 12(b)(2) is GRANTED. Defendants' motion to dismiss pursuant to Rule 12(b)(6) is also GRANTED.  The Clerk of Court is directed to close the motion at ECF No. 16 and this case.


Dated: New York, New York
      March 31, 2014

SO ORDERED.

GEORGE B. DANIELS
United States District Judge

23